IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RYE RIDGE CORP., a New York corporation, dba Rye Ridge Deli, HAROMAR, INC., a Connecticut corporation, dba Rye Ridge Deli, on behalf themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>THE CINCINNATI INSURANCE COMPANY, an Ohio corporation,<br><br>                Defendant. | Case No. 1:20-cv-7132<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**1. BREACH OF CONTRACT,**<br>**2. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING,**<br>**3. DECEPTIVE BUSINESS PRACTICES,**<br>**4. UNFAIR TRADE PRACTICES,**<br>**5. DECLARATORY RELIEF** |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    PARTIES .............................................................................................................. 3

    A.    Representative Plaintiffs ........................................................................ 3

    B.    Defendant .............................................................................................. 3

III.   JURISDICTION AND VENUE ......................................................................... 3

IV.   FACTUAL BACKGROUND .............................................................................. 4

    A.    The Rapid Spread of Coronavirus ........................................................ 4

    B.    Governments Around the Country Order Everyone to Shelter in Place ............... 6

    C.    The Delis Suspend Operations ............................................................ 10

    D.    These Losses Are Covered Business Interruptions .............................. 12

    E.    Defendant's Denial of Plaintiffs' Insurance Claim .............................. 17

V.    CLASSS ACTION ALLEGATIONS ............................................................... 21

VI.   CAUSES OF ACTION ..................................................................................... 25

FIRST CAUSE OF ACTION BREACH OF CONTRACT ........................................ 25

SECOND CAUSE OF ACTION BREACH OF COVENANT OF GOOD FAITH AND
    FAIR DEALING ........................................................................................... 26

THIRD CAUSE OF ACTION DECEPTIVE BUSINESS PRACTICES UNDER N.Y.
    GEN. BUS. LAW § 349, *ET SEQ.* ............................................................ 28

FOURTH CAUSE OF ACTION UNFAIR TRADE PRACTICES UNDER CONN. GEN.
    STAT. § 42-110A, *ET SEQ.* ...................................................................... 31

FIFTH CAUSE OF ACTION DECLARATORY RELIEF ....................................... 35

VII.  PRAYER FOR RELIEF .................................................................................. 37

VIII. JURY TRIAL DEMAND ................................................................................ 38

Plaintiffs RYE RIDGE CORP., a New York corporation, dba Rye Ridge Deli and HAROMAR, INC., a Connecticut corporation, dba Rye Ridge Deli (collectively "Plaintiffs" or "the Delis") file this Complaint Against The Cincinnati Insurance Company, an Ohio corporation, ("Cincinnati" or "Defendant"), on behalf of themselves and all others similarly situated, and allege as follows:

## I.   <u>INTRODUCTION</u>

1.      The Rye Ridge Delicatessens are a set of family-owned eateries operating in the Tri-State area for more than fifty years.  The original deli was founded in New York in 1962, and has been owned by Harry Martin since 1983.  He runs it with his son Scott Martin, who helped him expand the business into Connecticut in the last few years.  Beloved by the local community, Rye Ridge Deli's matzo ball soup was listed as a "Top 100" experience of 2016 by *Serendipity Magazine*,[1] and *Westchester Magazine* compared its pastrami and corned beef sandwiches to those of the Carnegie Deli and Katz's in Manhattan.[2]

2.      More than five months ago, the Rye Ridge Delis were forced to suspend operations and stop offering dine-in service.  This was triggered by the spread of Covid-19 and the orders of state governments who required the Delis, their workers, and their customers to "shelter in place" and abide by strict "social distancing" guidelines.  This resulted in a severe loss of revenue, quickly depleting the limited cash reserves that the Delis (and restaurants like them as well as other small businesses) typically hold.  The Delis also lost significant inventory, while continuing to pay rent for their all-but-empty stores.

---

[1] *Serendipity Magazine*, "Our Top 100: What to Eat, Wear, and Do in 2016!", Feb. 2017, https://www.ryeridgedeli.com/stamford/press.php (last accessed August 31, 2020). *See also* https://serendipitysocial.com/change-up-your-chicken-noodle-soup/ (last accessed August 31, 2020) (reflecting the top 100 tag).
[2] Andrew Dominick, *Westchester Magazine,* Pastrami and Corned Beef," May 2, 2016, https://westchestermagazine.com/food/pastrami-and-corned-beef/ (last accessed August 31, 2020).

3.      Notwithstanding the difficulties of this situation, the Delis retained all of their employees, without implementing any salary cuts.  Indeed, in the 38 years since Harry Martin has run the Delis, he has not laid off a single employee.  He hopes to someday retire without ever having had to do so.  Although the Delis have now "re-opened" in a limited manner, they are still generating a small fraction of their prior revenues. With reduced income—and mounting expenses—Harry may not be able to keep his promises to his staff indefinitely.  Absent a change in conditions or financial support, the Delis may have to make some difficult decisions about payroll.

4.      To avoid having to make such terrible choices, and to protect his employees, Harry Martin and the Delis purchased insurance from Defendant that included coverage for "business interruption."  The Delis understandably believed their "business interruption" insurance would protect their businesses in the unlikely event that they ever forced or ordered to close or reduce operations in connection with a pandemic or any other Covered Cause of Loss.

5.      Notwithstanding, and contrary to, the coverage provisions in their policies with Defendant, and the obligations Defendant undertook in exchange for the tens of thousands of dollars in insurance premiums the Delis remit each year, when Plaintiffs submitted claims with Defendant for coverage, Defendant denied both Delis' claims.  These denials were part of a premeditated strategy by Defendant to deny all claims related to COVID-19 and the "shelter in place" orders.  They were untethered to the facts of the claims, which Defendant did not adequately investigate, or the specific coverage provided by the Delis' policies, and were therefore illegal.

6.      The other members of the proposed Class, and New York and Connecticut Subclasses (each defined below), were subject to the same conduct by Defendant.  As a result of

2036672.1

Defendant's conduct alleged herein, the Delis and New York and Connecticut Subclass members suffered damages and, absent appropriate injunctive and declaratory relief, will continued to be harmed by Defendant's misconduct.

## II.   PARTIES

### A.   Representative Plaintiffs

7.     Plaintiff Rye Ridge Corp. ("Rye Ridge NY") is a New York corporation that does business as and owns Rye Ridge Deli, a restaurant located in Rye Brook, New York.

8.     Plaintiff Haromar, Inc. ("Rye Ridge CT") is a Connecticut corporation that does business as and owns Rye Ridge Deli, a restaurant in Stamford, Connecticut.

### B.   Defendant

9.     Defendant The Cincinnati Insurance Company is an Ohio corporation with its headquarters and principal place of business in Fairfield, Ohio.

## III.   JURISDICTION AND VENUE

10.     This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Class and New York and Connecticut Subclasses is a citizen of a state different from that of Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed Class and New York and Connecticut Subclasses each consist of more than 100 class members, and (d) none of the exceptions under 28 U.S.C. § 1332(d) apply to this action.

11.     This Court has personal jurisdiction over Defendant because Defendant is registered to sell insurance in New York, has sufficient minimum contacts in New York, and otherwise intentionally avails itself of the markets within New York through its business activities, such that the exercise of jurisdiction by this Court is proper.  Moreover, the claims of

Plaintiffs and all of the New York (and Connecticut) Subclass members in this case arise out of and directly relate to Defendant's contacts with New York.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendant has marketed, advertised, sold, and maintained insurance policies, and otherwise conducted extensive business, within this District.

## IV.     FACTUAL BACKGROUND

### A.     The Rapid Spread of Coronavirus

13.     COVID-19 is an infectious disease caused by a recently discovered novel coronavirus known as SARS-CoV-2 ("Coronavirus" or "COVID-19").  The first instances of the disease spreading to humans were diagnosed in or around December 2019.

14.     According to the World Health Organization ("WHO"): "People can catch COVID19 from others who have the virus.  The disease can spread from person to person through small droplets from the nose or mouth which are spread when a person with COVID-19 coughs or exhales.  These droplets land on objects and surfaces around the person.  Other people then catch COVID-19 by touching these objects or surfaces, then touching their eyes, nose or mouth.  People can also catch COVID-19 if they breathe in droplets from a person with COVID-19 who coughs out or exhales droplets."[3]

15.     This is problematic, *inter alia*, because a human sneeze can expel droplets of mucus and saliva that travel at nearly a hundred miles an hour and can spread up to 27 feet.[4]

---

[3] *See* Q&A on coronaviruses (COVID-19), "How does COVID-19 spread?," World Health Organization (April 16, 2020), *available at* https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited April 21, 2020).
[4] Sarah Gibbens, "See how a sneeze can launch germs much farther than 6 feet," *National Geographic* (April 17, 2020), *available at* www.nationalgeographic.com/science/2020/04/ coronavirus-covid-sneeze-fluid-dynamics-in-photos/ (last visited April 20, 2020).

16.     According to a recent report in the New York Times, "[a]n infected person talking for five minutes in a poorly ventilated space can produce as many viral droplets as one infectious cough."[5]  The more people in a conversation, the more droplets are dispersed.

17.     Although these droplets are smaller and less visible than rust, mold, or paint, they are physical objects which can travel to other objects and cause harm.

18.     These droplets can spread Coronavirus when they reach humans directly, or when they land on habitable surfaces where they can survive until that surface is touched by a potential human host.[6]

19.     Droplets containing Coronavirus infect a variety of surfaces and objects for a period of hours, days, or weeks, if not longer.  After inspecting a cruise ship inhabited by passengers carrying the Coronavirus, the CDC reported that Coronavirus was detectable on various surfaces inside the cruise ship up to 17 days after passengers had vacated the cabins.[7]

20.     Recent scientific evidence shows that Coronavirus can survive and remain virulent on stainless steel and plastic for three to six days; on glass and banknotes for three days; and on wood and cloth for 24 hours.[8]

---

[5] *See* Yuliya Pashina-Kottas, et al., "This 3-D Simulation Shows Why Social Distancing Is So Important, *The New York Times* (April 21, 2020), *available at* https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html (last visited April 21, 2020).

[6] *See*, *e.g.*, CDC website, "How COVID-19 Spreads*," 2020, *available at* https://www.cdc.gov /coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited April 21 2020).

[7] *See* Leah E. Moriary, et al., "Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020," 69 *Morbidity and Mortality Weekly Report* 347 (March 23, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf (last visited April 21, 2020).

[8] *See* Neeltje van Doremalen, et al., "Aerosol and Surface Stability of SARS-CoV-2 as Compared to SARS-CoV-1," New England Journal of Medicine (Mar. 17, 2020), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973 (last visited April 21, 2020); Alex W.H. Chin, et al., "Stability of SARS-CoV-2 in different environmental conditions," The Lancet Microbe (April 2, 2020), available at https://doi.org/10.1016/S2666-5247(20)30003-3 (last visited April 21, 2020).

21.     Testing involving similar viruses in the Coronavirus family shows that

Coronavirus can likely survive on ceramics, silicon rubber, or paper for up to five days if not

longer.

22.     When public areas containing such surfaces may have been exposed to

Coronavirus, a number of countries including China, Italy, France, and Spain have required such

areas to be fumigated prior to re-opening.[9]

23.     The Coronavirus has spread throughout New York, Connecticut, and the United

States.

**B.      Governments Around the Country Order Everyone to Shelter in Place**

24.     As the virus spread in New York and Connecticut, state officials began discussing

wide scale business closures.

25.     On March 13, 2020 President Trump declared the COVID-19 outbreak a national

emergency.

26.     On March 16, 2020, the Centers for Disease Control and Prevention, and

members of the National Coronavirus Task Force, issued guidance to the American public,

styled as "30 Days to Slow the Spread," concerning measures to slow the spread of COVID-19.

---

[9] *See* Mike Bird, et al., "China Is Open for Business, but the Postcoronavirus Reboot Looks Slow
and Rocky," *The Wall Street Journal* (March 26, 2020), *available at*
www.wsj.com/articles/china-is-open-for-business-but-the-post-coronavirus-reboot-looks-slow-
and-rocky-11585232600 (last visited April 22, 2020); Jason Horowitz, "In Italy, Going Back to
Work May Depend on Having the Right Antibodies," *The New York Times* (April 4, 2020),
*available at* www.nytimes.com/2020/04/04/world/europe/italy-coronavirus-antibodies.html (last
visited April 22, 2020); Sarah Elzas, "French Teachers Push Back against Reopening Schools in
May," *RFI* (released online Apr. 14, 2020), *available at* www.rfi.fr/en/france/20200414-french-
teachers-push-back-against-reopening-schools-in-may (last visited April 22, 2020); Claudia
Nuñez, "On the Front Line of the Coronavirus Threat in Spain, Tractors Scatter the Streets with
Hope," *Los Angeles Times* (March 27, 2020), *available at* www.latimes.com/world-
nation/story/2020-03-27/on-the-front-line-of-the-pandemic-tractors-scatter-the-streets-with-hope
(last visited April 22, 2020).

This guidance advocated for far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.

27.     Following this advice, and recognizing that there had been numerous confirmed cases of COVID-19 in their jurisdictions, many state government administrations across the nation recognized the need to take steps to protect their residents from the spread of COVID-19. As a result, many governmental administrations entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals.

28.     Specifically, the governments of New York, Connecticut, and New Jersey acted "jointly [to] reduce density," adopted what Governor Cuomo described as a "common set of rules that will pertain in all of our states" and "implement a uniform standard."[10] This coordinated approach included shutting down on-site service at all restaurants and bars.[11]

29.     Specifically, on March 16, 2020, Governor Cuomo, in conjunction with Governor Lamont,[12] ordered the closure of all gyms, movie theaters, bars and casinos.  Ex. 1 at 3; Ex. 2 at 4.[13]  Restaurants were also ordered to close their dine-in facilities and were only permitted to open for purposes of fulfillment of take-out and delivery orders.  *Id.* These orders were subsequently extended in April, 2020.

---

[10] Berkeley Lovelace Jr. et al., CNBC, "Coronavirus: NY, NJ, CT coordinate restrictions on restaurants, limit events to fewer than 50 people," March 16, 2020, 2.https://www.cnbc.com/2020/03/16/new-york-new-jersey-and-connecticut-agree-to-close-restaurants-limit-events-to-less-than-50-people.html, (last accessed August 31, 2020).
[11] *Id.*
[12] Governor Murphy of New Jersey issued a similar order.
[13] These orders were subsequently extended until May 15, 2020 by Governors Cuomo (NY), Murphy (NJ), and Lamont (CT).  *See* Caitlin Oprysko, Politico (April 16, 2020), "More than a dozen states have extended stay-home orders past White House deadline," https://www.politico.com/news/2020/04/16/coronavirus-stay-home-orders-extended-190889 (last accessed May 5, 2020).

30.     In May and June, these state governments modified the March 16 orders to allow certain restaurants to serve diners outdoors in a limited and heavily regulated manner. Ex. 3 at 3; Ex. 4 at 3; Ex. 5 at 4. In mid-June, the Orders were again modified to allow for certain indoor service in a limited and heavily regulated manner in certain locations. Ex. 6 at 2; Ex. 7 at 4–5. Collectively, the above-referenced orders of the State of New York and Connecticut are referred to herein as the "Orders."

31.     On March 28, 2020 the United States Department of Homeland Security issued a memorandum concerning the "Identification of Essential Critical Infrastructure Workers During Covid-19 Response."[14] This memorandum provided guidance for the implementation and standardization of all state shelter in place orders and the restrictions they place on different essential and non-essential businesses.

32.     Statewide efforts similar to New York and Connecticut's have been implemented around the country in response to literally millions of confirmed infections in the United States. State governments have required large scale business closures and imposed other limitations on customer and employee movement that prevent restaurants from operating and/or force them to suffer business losses.  For example, Governor Newsom of California issues a similar order on March 19, 2020.

33.     In all, 49 state governments have enacted at least one civil authority order prohibiting or severely limiting dine-in service and other operations at restaurants.[15] South Dakota is the only state whose government may not yet have enacted such an order at the state level.

---

[14] https://www.cisa.gov/sites/default/files/publications/Version_3.0_CISA_Guidance_on_Essential_Critical_Infrastructure_Workers_1.pdf
[15] https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/ (last accessed May 3, 2020)

34.     The Orders were issued in response to direct physical loss of and/or direct physical damage to properties, and particularly the harm caused by Coronavirus attaching itself to surfaces in highly-trafficked areas. When Governor Cuomo first declared Covid-19 a state of emergency on March 7, 2020, his order indicated that the action was being taken "to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property." Ex. 8 at 2. Echoing this, on May 9, 2020, Mayor de Blasio issued an emergency order within the state framework and acknowledged that it "is given because of the propensity of the virus to spread person-to person and also because the actions taken to prevent such spread have led to property loss and damage." Ex. 9 at 2. *See also* Ex. 10 at 2 (indicating that the City and County of Los Angeles issued closure orders "because, among other reasons, the COVID-19 virus can spread easily from person to person and it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time,"); Ex. 11 at 3 (reflecting similar findings and action by the City and County of San Francisco).

35.     In each jurisdiction, there were numerous individuals who tested positive for COVID-19, and the number of positive tests continues to grow.  Further, COVID-19 was and is present in these areas because, for example, it has attached to properties and surfaces on, at, or within properties, and also because COVID-19 was and is being transmitted in or between properties throughout these areas, including but not limited to transmission through the air, through ventilation systems, or through contact with contaminated surfaces.  The presence of COVID-19 resulted in and continues to result in direct physical loss, including but not limited to loss of use of businesses' properties, as well as direct physical damage to properties. The Orders

were issued by governmental entities due to these types of direct physical loss of, and/or direct physical damage to, properties within their respective jurisdictions.

      **C.**     **The Delis Suspend Operations**

36.     In reaction to the spread of the Coronavirus, and the Orders, the Delis suspended operations on or around March 16, 2020.

37.     As Coronavirus spread, the streets on which the Delis are located, and the buildings and objects in and around them, became a breeding ground for the disease. Numerous individuals around the Delis also tested positive for Coronavirus as it was assuredly being transmitted in or between properties throughout the areas near the Delis, including but not limited to transmission through the air, shared buildings and facilities, through ventilation systems, or through contact with contaminated surfaces.

38.     Events in Westport, Connecticut underscored these facts. The Rye Ridge Delis have a third branch in Westport (which is insured by a different insurance policy unconnected to Defendant). On or around April 7, 2020, an employee at the Westport Deli contracted the Coronavirus, which then spread to other employees. This forced the Westport Deli to shut down for about five weeks, and underscores the immediacy and imminence of the risks.

39.     The Coronavirus and its pernicious spread created inherently dangerous conditions where the Delis and property within them were at immediate and imminent risk of exposure to the Coronavirus. This caused them to suspend operations and lose access to the Delis, which rendered them untenantable.

2036672.1

40.     Under the Orders, the Delis were required to close their dining rooms[16] to the public, thereby prohibiting access to, use of, and operations at the Delis and rendering them untenantable.

41.     Under the Orders, the Delis were required to suspend dine in food offerings at the Delis and service of dine in food to customers, thereby prohibiting access to, use of, and operations at the Delis and rendering them untenantable.

42.     Under the Orders, customers were prohibited from accessing and using the Delis' dining rooms, thereby prohibiting access to, use of, and operations at the Delis and rendering them untenantable.

43.     Under the Orders, customers were prohibited by social distancing guidelines from accessing and utilizing the Delis' dining rooms, thereby prohibiting access to, use of, and operations at the Delis and rendering them untenantable.

44.     Under the Orders, the Delis' employees were prohibited from traveling to or accessing the Delis for purposes of preparing and serving dine in food, thereby prohibiting access to, use of, and operations at the Delis and rendering them untenantable.

45.     Under the Orders, the Delis' employees were prohibited from traveling to or accessing portions of the Delis (and property therein) utilized exclusively for preparing and serving dine in food, thereby prohibiting access to, use of, and operations at the Delis and rendering them untenantable.

46.     Under the Orders, the Delis' employees were prohibited from working in close proximity to each other, thereby prohibiting access to, use of, and operations at the Delis and

---

[16] All references to dining rooms are inclusive of any indoor seating area.

rendering them untenantable.  This includes, but is not limited to, social distancing requirements and other safety requirements that are not compatible with professional use of a kitchen.

47.     Under the Orders, both Delis lost access to portions of the Delis (and property therein), lost use of the Delis (and property therein), lost necessary use of necessary facilities at the Delis (and property therein), and suspended operations at the Delis which became untenantable.

48.     Because, *inter alia*, the spread of Coronavirus rendered the Deli's facilities no longer usable for their intended purpose(s), and in many cases impossible to operate safely, it directly caused them to suffer physical damage and loss.

49.     As a result of the spread of Covid-19, and related government orders, customers and dependent properties were unable to and/or prohibited from holding events from which the Delis were contacted to generate and usually generated catering income. Due to the losses described above, the Delis were also unable to fulfill any such orders.

50.     As a result, both Delis suffered and continue to suffer substantial lost business income and other financial losses.

51.     These extraordinary losses of business income (and concern for their employees' welfare) are precisely why the Delis took out insurance policies with Defendant that included business interruption coverage, which were meant to cover these losses.

### D.     <u>These Losses Are Covered Business Interruptions</u>

52.     The Delis purchased insurance policies from Defendant that included business interruption (and other related) insurance coverage.

53.     Rye Ridge NY has promptly and dutifully paid its premiums and complied with all other elements of its agreements with Defendant.  Its policy number is ECP 055 80 49.

54.     Rye Ridge CT has promptly and dutifully paid its premiums and complied with all other elements of its agreements with Defendant.  Its policy number is ECP 055 79 23. Collectively ECP 055 80 49 and ECP 055 79 23 shall be referred to as the "Policies."

55.     In many countries, property insurance is sold on a specific peril basis. Such policies only cover losses from causes that are expressly covered like an earthquake, fire, or terrorist attack.  Most property policies sold in the United States are all-risk property damage policies which cover losses from all causes that are not expressly excluded.

56.     The Policies are all-risk property damage policies because their terms indicate that they cover all risks which can cause harm to physical property except for risks that are expressly and specifically excluded.  In the Building and Personal Property Coverage Form provided to Plaintiffs, under the heading "Covered Causes of Loss," Defendant agreed to cover and pay for all "direct 'loss' unless the 'loss' is excluded or limited" by a later provision of the policy. Ex. 12aa at 39; Ex. 13a at 34.

57.     The Policies provide coverage for Lost Business Income, promising that Defendant "will pay for the actual loss of 'Business Income' and 'Rental Value' you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'.  The 'suspension' must be caused by direct 'loss' to property at a[n insured] 'premises.'" Ex. 12a at 52; Ex. 13a at 47. *See also* Ex. 12a at 112; Ex. 13a at 103.[17]

58.     The Policies define a "suspension" as "the slowdown or cessation of your business activities and that a part or all of the 'premises' is rendered untenantable". Ex. 12a at 74; Ex. 13a at 69. *See also* Ex. 12a at 120; Ex. 13a at 110.

---

[17] The Policies each include additional forms that provide "separate Business Income" and "separate Civil Authority coverage provisions." Ex. 14 at 5, 7; Ex. 15 at 5, 7; *accord* Ex. 12a at 112; Ex. 13a at 103.

59.     The Policies include a putative definition of the term "loss" as encompassing "accidental physical loss or accidental physical damage." Ex. 12a at 72; Ex. 13a at 67. *See also* Ex. 12a at 120; Ex. 13a at 110.

60.     The term "loss" itself is not defined in the policy. *Id.*

61.     Similar and supplemental coverage is available for inability to utilize existing ingresses and egresses to the Delis and dependent properties. Ex. 12a at 79–80, 115; Ex. 13a at 72, 105.

62.     As described above, the Delis suffered losses when Coronavirus and related government orders caused them to lose physical access to, use of, and operations at and by the Delis, their employees, and their customers. This includes, among other things, loss of the ability to welcome customers onto the Delis' physical premises, offer the physical dining experience of eating on site, access or utilize any of the physical property associated with these activities, access and utilize the ingresses and egresses at or to the Delis or properties upon which they depend in order to generate income. As a result of the Orders, physical components of the Delis became unusable, untenantable, damaged, and/or lost the ability to generate income.

63.     As a direct result of this physical loss or damage, the Delis suspended operations, lost business income, and suffered other related covered losses (including but not limited to extended business income, lost inventory, and extra expenses). The extra expenses include (but are not limited to) outdoor seating and related equipment and protective equipment for employees.

64.     The Delis' Policies also provide Civil Authority coverage, pursuant to which Defendant agreed that it "will pay for the actual loss of 'Business Income' you sustain and necessary Extra Expense you sustain caused by action of civil authority that prohibits its access

-14-

2036672.1

to the 'premises provided that . . . (a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and (b) The action of civil authority is taken in response to dangerous physical conditions resulting from [covered] damage." Ex. 12a at 53; Ex. 13a at 48. *See also* Ex. 12a at 113; Ex. 13a at 103 (providing similar coverage with some difference in terms such as the removal of the term

"its" in "prohibits its access to").

65.     The Orders required customers, employees, and members of the public to shelter in place. This included prohibiting members of the public, or even employees, from accessing areas immediately surrounding businesses like Plaintiffs' (except potentially if those areas were necessary for a specifically permitted activity like seeking food or medicine).

66.     The Delis are located in New York and Connecticut.  As the Coronavirus spread, the streets on which the Delis are located, and the buildings and objects in and around them, became a breeding ground for the disease.

67.     The Orders were issued due to direct physical loss of and/or direct physical damage to properties.  There are numerous individuals who have tested positive for COVID-19, and those numbers continue to grow.  COVID-19 was and is present in these areas because, for example, it has attached to properties and surfaces on, at, or within properties near the Delis; and because COVID-19 was and is being transmitted in or between properties throughout the areas near the Delis, including but not limited to transmission through the air, through ventilation systems, or through contact with contaminated surfaces.   The presence of COVID-19 resulted in and continues to result in direct physical loss, including but not limited to loss of use of properties, as well as direct physical damage to properties, and this direct physical loss and/or direct physical damage prompted the issuance of the Orders. Underscoring this, prior to the

issuance of the Orders, government authorities had been limiting access to other properties on the basis of the Coronavirus, including (but not limited to) sporting arenas, concert venues, and other places where large numbers of people may gather.

68.     The prohibitions and limitations imposed by the Orders prohibited access to, use of, and operations at and by the Delis, their employees, and their customers.  As a result of the Orders, components of the Delis became unusable and/or lost the ability to generate income.

69.     As a result, the Delis lost business income, and suffered other related covered losses (including but not limited to extended business income, lost inventory, and extra expenses).

70.     COVID-19 is a Covered Cause of Loss under the Policies.

71.     The Building and Personal Property Coverage Form (FM 101 05 16) which defines the Policies' Lost Business Income and Civil Authority coverage is a standardized form drafted by the Insurance Services Office ("ISO"). Ex. 12a at 35; Ex. 13a at 30. *See also* Ex. 12a at 112; Ex. 13a at 103. On information and belief, the form used for the Policy is also used by Defendant for numerous other insurance policies issued by Defendant to the Class members.

72.     The ISO is a company that drafts standard policy language for use in insurance contracts used by insurers around the country.

73.     In 2006, the ISO drafted a new endorsement, CP 01 40 07 06, acknowledging that claims for business interruption losses would be filed under existing policy language for losses resulting from the presence of disease-causing agents.  Endorsement CP 01 40 07 06, which other insurers have since incorporated in policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

74.     When preparing CP 01 40 07 06, ISO circulated a statement to state insurance regulators that included the following acknowledgement:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

75.     The insurance industry has thus recognized that the presence of virus or disease can constitute physical damage to property since at least 2006.

76.     Defendant intentionally chose not to include CP 01 40 07 06 in the Policies and in its insurance policies issued to other Class members.

77.     Defendant is aware of contractual force majeure clauses that suspend duties to perform in the event of a global pandemic.

78.     Defendant chose not to use force majeure clauses in the Policies or in insurance policies issued to other Class and New York and Connecticut Subclass members.

**E.     Defendant's Denial of Plaintiffs' Insurance Claim**

79.     In or around the week of March 16, 2020, Plaintiff Rye Ridge NY requested insurance coverage from Defendant through its broker. It then tendered by letter on June 5, 2020. This claim was later assigned the identifying number 3567132.

80.     On June 24, 2020 Defendant wrote to Plaintiff and indicated that "Cincinnati will investigate your claim." Ex. 16 at 2. Following this letter, Cincinnati did not adequately

investigate the claim. It ultimately denied Plaintiffs' claims without any inspection or review of the Delis' physical locations or documents concerning their business activities in 2020.

81.     The June 24, 2020 letter contains nearly 7 pages of putative reasons for Cincinnati to deny the claim. *Id*. at 2–9. This language closely parallels the denial letter that Cincinnati would ultimately send Plaintiff. As of the writing of the letter, Cincinnati had already decided to deny the claim. Even so, notwithstanding how long the claim had been pending, Cincinnati did not inform the insured of this coverage decision.

82.     Instead it asked Plaintiff a series of questions related to the legal basis for its claim. When Plaintiff responded with the information known to him, referencing events that have become common knowledge to most everyone in the United States, Cincinnati did not accept his answers and provide a coverage decision.

83.     This strategy was designed to discourage Plaintiffs from obtaining a denial of coverage, allowing the claim to remain in an "investigation" stage indefinitely until it could be closed, Plaintiffs gave up, and/or the statute of limitations ran.

84.     Only after Plaintiff retained counsel and through them insisted upon a coverage decision did Defendant ultimately deny the claim on August 25, 2020, more than three months after the claim was submitted. Ex. 14.

85.     In or around the week of March 16, 2020, Plaintiff Rye Ridge CT requested insurance coverage from Defendant through its broker. It then tendered by letter on June 5, 2020. This claim was later assigned the identifying number 3567222.

86.     On June 11, 2020 Defendant wrote to Plaintiff and indicated that "Cincinnati will investigate your claim." Ex. 17 at 2. Following this letter, Cincinnati did not adequately investigate the claim. It ultimately denied Plaintiffs' claims without any inspection or review of

-18-

the Delis' physical locations or documents concerning their business activities in 2020. Even so, notwithstanding how long the claim had been pending, Cincinnati did not inform the insured of this coverage decision.

87.     The June 11, 2020 letter contains nearly 7 pages of putative reasons for Cincinnati to deny the claim. *Id.* at 2–9. This language closely parallels the denial letter that Cincinnati would ultimately send Plaintiff. As of the writing of the letter, Cincinnati had already decided to deny the claim.

88.     Instead it asked Plaintiff a series of questions related to the legal basis for its claim. When Plaintiff responded with the information known to him, referencing events that have become common knowledge to most everyone in the United States, Cincinnati did not accept his answers and provide a coverage decision.

89.     This strategy was designed to discourage Plaintiffs from obtaining a denial of coverage, allowing the claim to remain in an "investigation" stage indefinitely until it could be closed, Plaintiffs gave up, and/or the statute of limitations ran.

90.     Only after Plaintiff retained counsel and through them insisted upon a coverage decision did Defendant ultimately deny the claim on August 25, 2020, more than three months after the claim was submitted. Ex. 15.

91.     By denying Plaintiffs' claims without inspecting the Delis premises, Defendant has waived any right to inspect those premises, deny coverage for any reason related to conditions at those locations, or raise any defense related to conditions at those locations or facts specific to the Delis.

92.     The nature of Defendant's denial of the Delis' claims, and their lack of consideration given to the specific details of the claim, indicate that Defendant could not have

engaged in a good faith or reasonable investigation of the claims which included assessment of

facts or issues relevant to the Delis.

93.     Defendant accepted the premiums paid by the Delis with no intention of providing

lost business income, physical damage, civil authority, or other applicable coverage for claims

like those submitted by Plaintiffs and the proposed Class members and which were denied by

Defendant.

94.     Defendant's rejection of the Delis' claims was part of a policy by Defendant to

limit its losses during this pandemic, notwithstanding that the Policies provide coverage for

losses due to loss of use of property and from Covid-19 orders issued by civil authorities (among

other coverage).

95.     Although industry trade groups have argued that insurance companies do not have

the funds to pay claims related to the Coronavirus and will require government assistance, the

reality is that insurers are simply trying to minimize their exposure.  "According to data from

ratings firm A.M. Best Co., the insurance industry as a whole has $18.4 billion in net reserves for

future payouts.[18]

96.     Upon information and belief, Cincinnati collected well over a billion dollars in

property insurance premiums in 2019 alone.[19]  Notwithstanding this, Defendant appears to be

categorically denying claims brought by businesses ordered to close following the Coronavirus,

including those brought by Plaintiffs and the proposed Class.  This deliberate strategy and

---

[18] Leslie Scism, "U.S. Businesses Gear Up for Legal Disputes With Insurers Over Coronavirus Claims," *Wall Street Journal* (March 6, 2020), *available at* https://www.wsj.com/articles/u-s-businesses-gear-up-for-legal-disputes-with-insurers-over-coronavirus-claims-11583465668?mod=article_inline (last accessed May 4, 2020).
[19] National Association of Insurance Commissioners, "Property and Casualty Insurance Industry 2019 Top 25 Groups and Companies by Countrywide Premium," p. 5 https://www.naic.org/documents/web_market_share_property_casualty.pdf?17 (last accessed August 31, 2020).

common policy, and the insurance industry's public requests for government assistance, suggest strongly that their true goal is minimizing payments by any means necessary.

97.     Defendant's wrongful denials of the Plaintiffs' claims were not isolated incidents. Rather, on information and belief, Defendant has engaged in the same misconduct, alleged herein with respect to Plaintiffs, in connection with claims submitted by numerous of Defendant's insureds who have suffered losses related to the Coronavirus pandemic and submitted claims which were categorically denied.

98.     Plaintiffs' claims and those of the proposed Class all arise from a single course of conduct by Defendant: its systematic and blanket refusal to provide any coverage for business losses related to the COVID-19 pandemic and the related actions taken by civil authorities to suspend business operations.

99.     Defendant's wrongful conduct alleged herein has caused significant damage, and if left unchecked will continue to cause significant damage to Plaintiffs and the other members of the proposed Class.

100.    Defendant's categorical treatment, failure to investigate in good faith, and denial of Plaintiffs' and the Class members' claims appears to be part of a broader strategy being employed by the insurance industry generally, to broadly deny claims for business interruption coverage related to the Coronavirus pandemic, as has been widely reported by the media and resulted in numerous lawsuits brought by businesses against property insurance companies throughout the country.

## V.    **CLASSS ACTION ALLEGATIONS**

101.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiffs bring their claims (as further indicated below) on behalf of themselves and a "Class," "New York Subclass," and "Connecticut Subclass" defined as:

**Class**

All persons or entities in the United States (including its territories and the District of Columbia) who own an interest in a business that served food on the premises and were insured by Defendant in March 2020, made (or attempted to make) a claim with Defendant arising from lost business income (or other losses related to business interruption) at that business related to COVID-19, and did not receive coverage for that claim.

**New York Subclass**

All persons or entities who own an interest in a business in New York that served food on the premises and were insured by Defendant in March 2020, made (or attempted to make) a claim with Defendant arising from lost business income (or other losses related to business interruption) at that business related to COVID-19, and did not receive coverage for that claim.

**Connecticut Subclass**

All persons or entities who own an interest in a business in Connecticut that served food on the premises and were insured by Defendant in March 2020, made (or attempted to make) a claim with Defendant arising from lost business income (or other losses related to business interruption) at that business related to COVID-19, and did not receive coverage for that claim.

102.    Excluded from the Class and Subclasses are Defendant and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his immediate family. Plaintiffs reserve the right to revise the Class and/or Subclass definitions based upon information learned through discovery or as otherwise may be appropriate.

103.    Pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs seeks to represent the above Subclasses as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the time of class certification.

104.    **Numerosity: Rule 23(a)(1).** The Class and Subclasses are too numerous and dispersed for joinder of all Class members to be practicable.  On information and belief, the Class and Subclasses each consist of at least hundreds, if not thousands, of persons and entities.

The precise number of Class and Subclass members can be ascertained from Defendant's records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and published notice.

105.    **Commonality: Rules 23(a)(2)**. This action involves significant common questions of law and fact, including, but not limited to:

a.      Whether the insurance policies issued by Defendant to Plaintiffs and the Class are all-risk policies?

b.      Whether the actions of civil authorities taken in response to the presence or threat of COVID-19 required a suspension at businesses serving food on the premises?

c.      Whether the actions of civil authorities taken in response to the presence or threat of COVID-19 prohibited access at businesses serving food on the premises?

d.      Whether Defendant's Business Income coverage applies to a suspension of business caused by COVID-19 and/or related actions of civil authorities taken in response to the presence or threat of COVID-19;

e.      Whether Defendant's Civil Authority coverage applies to a loss of business income caused by the orders of local, municipal, city, county, and/or state or national governmental entities requiring the suspension of business during the outbreak of COVID-19 in the United States;

f.      Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 breach Defendant's insurance contracts?

-23-

g.      Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are an unfair business practice?

h.      Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are a deceptive business practice?

i.      Whether blanket denials of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are an unlawful business practice?

j.      Whether Plaintiffs and the Class members are entitled to a declaratory judgment as to the meaning of their policies?

106.    ***Typicality: Rule 23(a)(3).*** Plaintiffs' claims are typical of the claims of the Class and Subclass members whom they seek to represent.  Plaintiffs and all Class members purchased insurance coverage from Defendant that included coverage for business interruption and all had claims denied pursuant to Defendant's misconduct alleged herein.  Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

107.    ***Adequacy: Rule 23(a)(4).*** Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclass members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including insurance coverage and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members.

108.    ***Rule 23(b)(2).*** Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class and Subclasses, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class and Subclasses as a whole.

109.    ***Rule 23(b)(3).*** Common questions of law and fact will predominate over any questions, if any, affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct.

110.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    <u>CAUSES OF ACTION</u>

### <u>FIRST CAUSE OF ACTION</u>
### <u>Breach of Contract</u>

### (On Behalf of Plaintiffs and the Class)

111.    Plaintiffs re-allege and incorporate by reference into this cause of action all allegations set forth in paragraphs 1–110 of this Complaint.

112.    Plaintiffs bring this cause of action on behalf of themselves and the proposed Class.

113.    At all times relevant herein, Plaintiffs and the Class have paid all premiums and fulfilled or performed all obligations they have to Defendant, including those under all relevant insurance policies described in this complaint.

114.    Defendant had contractual duties to provide Plaintiffs and the Class with insurance coverage, as alleged herein.

115.    By its conduct alleged herein, including denying Plaintiffs' and the Class members' insurance claims and refusing to perform under the contract, Defendant breached those duties.

116.    As a result of Defendant's breaches, Plaintiffs and the Class have been damaged in the amount of coverage to which they are entitled pursuant to their insurance agreements, the premiums they paid, and in an amount to be proved at trial.  Plaintiffs seek compensatory damages with interest thereon for themselves and the Class members.

117.    The Delis attempted to mitigate the lost income but have been unable to. While in-deli service was shutdown, to go and delivery service provided only a fraction of normal income. Even prior to the events described in this Complaint, the Delis offered only minimal outdoor service. This practice, and socially distanced indoor dining, serve fewer guests and are insufficient to generate the income necessary to mitigate the Delis' losses.

### SECOND CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing

### (On Behalf of Plaintiffs and the Class)

118.    Plaintiffs re-allege and incorporate by reference into this cause of action all allegations set forth in paragraphs 1–110 of this Complaint.

119.    Plaintiffs bring this cause of action on behalf of themselves and the proposed Class.

120.    When Defendant entered its agreements with Plaintiffs and the Class, and with an successive amendments thereto, Defendant undertook and were bound to covenants implied by law that they would deal fairly and in good faith with Plaintiffs and the Class, and not engage in any acts, conduct, or omissions that would diminish the rights and benefits due Plaintiffs and the Class or defeat the reasonable expectations of Plaintiffs and the Class under the their agreements with Defendant.

121.    By its conduct alleged herein, Defendant breached the implied covenant of good faith and fair dealing arising out of its agreements with Plaintiffs and the Class including but not limited to by: (a) unreasonably and in bad faith denying Plaintiffs and the Class members insurance coverage to which they are entitled; (b) failing and refusing to perform a fair, objective, good faith, and thorough investigation of the claim; (c) asserting coverage defenses that were legally and/or factually invalid and thereby delaying resolution of Plaintiffs' and the Class members' claims; and (d) placing unduly restrictive interpretations on the terms of its insurance policies for the purpose of denying coverage due.

122.    In committing its breaches, Defendant has acted with malice, shown a reckless and outrageous indifference to a highly unreasonable risk of harm, and acted with a conscious indifference to Plaintiffs' and the Class members' rights and welfare, thereby entitling Plaintiffs and the Class members to punitive and exemplary damages against the Defendant.  As a direct and proximate result of the above-referenced breach, Plaintiffs have had to retain attorneys to enforce their rights, and those of the proposed Class, to the insurance coverage to which they are entitled and have thereby been injured and damaged.

123.    Plaintiffs, therefore, are entitled to recover and seek in connection with this Cause of Action, for themselves and the Class: (a) an award of general damages and other monetary

-27-

damages, including all foreseeable consequential and incidental damages for diminution in value, loss of use, and other incidental damages and out-of-pocket expenses, plus interest, in an amount to be determined at trial; (b) punitive and exemplary damages in an amount to be determined at trial; (c) costs of suit; and (d) reasonable attorney's fees in connection with this action.

### THIRD CAUSE OF ACTION
### Deceptive Business Practices Under N.Y. Gen. Bus. Law § 349, *et seq.*

#### (On Behalf of Plaintiffs and the New York Subclass)

124.    Plaintiffs re-allege and incorporate by reference into this cause of action all allegations set forth in paragraphs 1–110 of this Complaint.

125.    Plaintiffs bring this cause of action on behalf of themselves and the proposed New York Subclass.

126.    The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349, *et seq.* ("DAPA").

127.    Defendant is a "person" within the meaning of N.Y. Gen. Bus. Law § 349, *et seq.*.

128.    The sale and provision of insurance to a business is "trade" or "commerce" within the meaning of the statute.

129.    Defendant's conduct alleged herein were deceptive because, among other things, Defendant: (a) promised Plaintiffs and the New York Subclass coverage that was not provided and that Defendant had no intention of providing; (b) promised to evaluate each claim individually, reasonably, and in good faith, which Defendant did not do with respect to Plaintiffs' and the New York Subclass members claims;  falsely and misleadingly indicated to Plaintiffs and the New York Subclass that it was investigating in good faith (and had investigated in good faith) their claims which Defendant did not do and knew that it did not do.  Defendant collected Plaintiffs' and the New York Subclass members' premiums in exchange for coverage

that was not provided, induced those premiums by promising to evaluate each claim individually, reasonably, and in good faith and did not, and denied Plaintiffs' and the New York Subclass members' claim as part of a policy of categorically denying claims related to the Coronavirus as part of a strategy to reduce its total insurance payments related to the Coronavirus.

130.     Defendant's deceptive conduct alleged herein was false and misleading had a tendency to deceive reasonable insureds about information material to their coverages, and did deceive Plaintiffs and the New York Subclass.  Plaintiffs and the New York Subclass members reasonably relied on Defendant's deceptions and omissions alleged herein, including but not limited to by paying premiums to Defendant.

131.     Underscoring the illegality of this conduct, the acts described above violate N.Y. Ins. Law § 2601, *et seq.*, which prohibits unfair practices in the sale, evaluation, provision of insurance coverage. Defendant's violations of this statute include it (a) categorically denying all or at least the vast majority of business interruption claims related to the Coronavirus (b) without a fair, objective, and thorough investigation of all available facts (and ignored other applicable requirements concerning the proper and fair evaluation of claims and interpretations of its policies), as well as (c) failing to communicate its predetermined negative response to the tender of insurance coverage to its insurers within a reasonable time and falsely claiming that other information was needed and/or that an investigation was ongoing when it was not; (d) failing to reasonably acknowledge and respond to communications from the insured seeking coverage, coverage decisions, and/or information on Defendant's "investigation"; and (e) knowingly misrepresenting the insurance coverage that it would and did provide (and facts related to those provisions).

132.    Defendant intentionally and knowingly engaged in the above conduct in order to reduce the insurance coverage it would have to provide and encouraged policyholders not to pursue their claims.

133.    Defendant knew or should have known that this conduct violates the DAPA.

134.    To the extent Defendant's insurance policies offer coverage that is entirely or almost entirely excluded by other provisions of the policies, its offers of coverage and related communications are fraudulent, unfair, and unlawful. Specifically they deliberately and fraudulently induce Plaintiffs and class members to purchase insurance based on false premises which they would have known that Plaintiffs and class members would reasonably rely upon. Such conduct is particularly deceptive and unfair to the extent that the true nature of the illusory coverage is not readily discernable, particularly to a layperson, from the language of the policy. Indeed based on the decision to include certain coverages in a policy, a purchaser of insurance would reasonably assume that there is no exclusion which effectively nullifies that coverage. Such deception in the sale of insurance is also illegal under New York law.

135.    As a direct and proximate result of Defendant's deceptive conduct in violation of the DAPA, Plaintiffs and the New York Subclass members suffered and continue to suffer ascertainable damages, including but not limited to premiums they have paid to Defendant and the non-receipt of insurance benefits that are owed to them by Defendant.

136.    As a result of the foregoing willful, knowing, and wrongful conduct of Defendant, Plaintiffs and the New York Subclass have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law,

2036672.1

reasonable attorneys' fees and costs, an order enjoining Defendant's deceptive and unfair conduct, and all other just and appropriate relief available under the DAPA.

137.    Defendant's violations present a continuing risk to Plaintiffs as well as to the general public and its interests because they have categorically denied claims to entire industries upon which the public depends for support, services, and jobs, denied coverage to struggling small businesses who depend on business interruption coverage, and may force specific business upon which members of the public and first-responders depend for services out of business. These risks are ongoing because Defendant is continuing to deny similar claims.

## FOURTH CAUSE OF ACTION
### Unfair Trade Practices Under Conn. Gen. Stat. § 42-110a, *et seq.*

**(On Behalf of Plaintiffs and the Connecticut Subclass)**

138.    Plaintiffs re-allege and incorporate by reference into this cause of action all allegations set forth in paragraphs 1–110 of this Complaint.

139.    Plaintiffs bring this cause of action on behalf of themselves and the proposed Connecticut Subclass.

140.    The Connecticut Unfair Trade Practices Act ("UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

141.    Defendant is a "person" within the meaning of this statute.

142.    The sale and provision of insurance to a business is "trade" or "commerce" within the meaning of the statute.

143.    Defendant's conduct alleged herein violates the "unfair … acts or practices" prong(s) of the  UTPA, including but not limited to Defendant's: (a) categorical and wrongful denial of Plaintiffs' and the Connecticut Subclass members' claims under the circumstances

described in this complaint; (b) failure and refusal to perform a fair, objective, good-faith, and thorough investigation of the claims as directed by the Connecticut Insurance Code (and in manner violating the Connecticut Unfair Insurance Practices Act Conn. Gen. Stat.§ 38a-816 *et seq.*); (c) denial of Plaintiffs' and the Subclass members' claims as part of a policy of categorically denying claims related to the Coronavirus; and (d) and failing to interpret its policies in an equitable manner and/or up to the standards required by Connecticut law.

144.    The preceding conduct also constitutes unfair methods of competition because the unfair practices described permit Defendant to outperform its competition who does not engage in such conduct prohibited by law. It also harms competition between businesses in the industries Defendant insures by causing undue harm to the businesses it insurers, unfairly advantaging those which it does not insure.

145.    Defendant's conduct alleged herein also violates the "deceptive" prong of the UTPA.  Among other things, Defendant: (a) promised Plaintiffs and the Connecticut Subclass coverage that was not provided and that Defendant had no intention of providing; (b) promised to evaluate each claim individually, reasonably, and in good faith, which Defendant did not do with respect to Plaintiffs' and the Connecticut Subclass members claims;  falsely and misleadingly indicated to Plaintiffs and the Connecticut Subclass that it was investigating in good faith (and had investigated in good faith) their claims which Defendant did not do and knew that it did not do.  Defendant collected Plaintiffs' and the Connecticut Subclass members' premiums in exchange for coverage that was not provided, induced those premiums by promising to evaluate each claim individually, reasonably, and in good faith and did not do so, and denied Plaintiffs' and the Connecticut Subclass members' claim as part of a policy of

categorically denying claims related to the Coronavirus as part of a strategy to reduce its total insurance payments related to the Coronavirus.

146.     Defendant's fraudulent and deceptive conduct alleged herein was false and misleading and had a tendency to deceive reasonable insureds about information material to their coverages, and did deceive Plaintiffs and the Connecticut Subclass.  Plaintiffs and the Connecticut Subclass members reasonably relied on Defendant's deceptions and omissions alleged herein, including but not limited to by paying premiums to Defendant.

147.     Underscoring the illegality of this conduct, the acts described above all violate Conn. Gen. Stat.§ 38a-816 *et seq.,* which prohibits unfair practices in the sale, evaluation, provision of insurance coverage. Defendant's violations of this statute, and particularly Conn. Gen. Stat.§ 38a-816(6)(B–G) include it (a) categorically denying all or at least the vast majority of business interruption claims related to the Coronavirus (b) without a fair, objective, and thorough investigation of all available facts (and ignored other applicable requirements concerning the proper and fair evaluation of claims and interpretations of its policies); as well as (c) failing to communicate their predetermined negative response to the tender of insurance coverage to its insurers with reasonable time and falsely claiming that other information was needed and/or that an investigation was ongoing when it was not; (d) failing to reasonably acknowledge and respond to communications from the insured seeking coverage, coverage decisions, and/or information on Defendant's "investigation"; and (e) misrepresenting the insurance coverage that it would and did provide (and facts related to those provisions).

148.     Defendant intentionally and knowingly engaged in the above conduct in order to reduce the insurance coverage it would have to provide and encouraged policyholders not to pursue their claims.

149.    Defendant knew or should have known that this conduct violates the UTPA.

150.    To the extent Defendant's insurance policies offer coverage that is entirely or almost entirely excluded by other provisions of the policies, its offers of coverage and related communications are fraudulent, unfair, and unlawful. Specifically they deliberately and fraudulently induce Plaintiffs and class members to purchase insurance based on false premises which they would have known that Plaintiffs and class members would reasonably rely upon. Such conduct is particularly deceptive and unfair to the extent that the true nature of the illusory coverage is not readily discernable, particularly to a layperson, from the language of the policy. Indeed based on the decision to include certain coverages in a policy, a purchaser of insurance would reasonably assume that there is no exclusion which effectively nullifies that coverage. Such deception in the sale of insurance is also illegal under Connecticut law.

151.    By reason of Defendant's unfair and/or deceptive conduct in violation of the UTPA, Plaintiffs and the Connecticut Subclass members suffered and continue to suffer ascertainable damages, including but not limited to premiums they have paid to Defendant and the non-receipt of insurance benefits that are owed to them by Defendant.

152.    Defendant's violations present a continuing risk to Plaintiffs as well as to the general public and its interests because they have categorically denied claims to entire industries upon which the public depends for support, services, and jobs, denied coverage to struggling small businesses who depend on business interruption coverage, and may force specific business upon which members of the public and first-responders depend for services out of business. These risks are ongoing because Defendant is continuing to deny similar claims.

153.    As a direct and proximate result of Defendant's violations of the UTPA, Plaintiffs and the Connecticut Subclass have suffered injury-in-fact and/or actual damage.

154.    Plaintiffs and the Connecticut Subclass are entitled to their actual damages, punitive damages, attorneys' fees, and an injunction prohibiting the illegal conduct under to Conn. Gen. Stat. § 42-110g. Plaintiffs and the Connecticut Subclass also seek all other relief which is just and proper under the UTPA.

155.    The aforementioned conduct was undertaken with reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise amounted to a particularly aggravated, deliberate disregard of the rights and safety of others.

### FIFTH CAUSE OF ACTION
### Declaratory Relief

**(On Behalf of Plaintiffs and the Class)**

156.    Plaintiffs re-allege and incorporate by reference into this cause of action all allegations set forth in paragraphs 1–110 of this Complaint.

157.    Plaintiffs bring this cause of action on behalf of themselves and the proposed Class.

158.    The Court may declare rights, duties, statuses, and other legal relations, regardless of whether further relief is or could be claimed.

159.    An actual controversy has arisen between Plaintiffs and the Class and Defendant as to their respective rights and duties under Plaintiffs' and the Class members' insurance policies.

160.    Resolution of the parties' respective rights and duties under Plaintiffs' and the Class members' insurance policies by declaration of the Court is necessary, as there exists no adequate remedy at law.

161.    Plaintiffs allege and contend, with respect to Plaintiffs' and the Class members' Civil Authority coverage, that the above-described orders trigger that coverage because (a) they

are orders of a civil authority, (b) the orders specifically prohibit access to the premises in question, including prohibiting potential on-premises dining customers and workers from accessing the premises in question, (c) such access prohibition has been continuous and ongoing since the orders were issued, such that the prohibited access has not subsequently been permitted, (d) the orders prohibit access as the direct result of direct physical loss of or damage to property, other than at the premises in question, caused by or resulting from a Covered Cause of Loss (e) no coverage exclusions or limitations apply to exclude or limit coverage, (f) Plaintiffs and the Class have suffered actual and covered loss of Business Income in an amount to be determined at trial, and (g) coverage should begin as of dates to be determined at trial.

162.    Plaintiffs allege and contend that Plaintiffs' and the Class members' Lost Business Income Coverage is triggered because (a) Plaintiffs and the Class members have sustained actual loss of Business Income due to the closure of their indoor dining, (b) said closure constitutes a necessary suspension of their  operations under their insurance policies, (c) this suspension has been and is caused by direct physical loss of or physical damage to property at the premises in question, including personal property in the open (or in a vehicle) within 1,000 feet of the premises in question, due to the presence of Coronavirus, (d) the presence of Coronavirus is a Covered Cause of Loss, and (e) some or all of the periods of the Plaintiffs' and Class members'  closures are within the period of restoration under their  insurance policies.

163.    Plaintiffs allege and contend that Defendant wrongly denied coverage with respect to all the foregoing provisions, as to Plaintiffs and the Class.

164.    Upon information and belief, Plaintiffs allege that Defendant disputes and denies each of Plaintiffs' contentions set forth in this Cause of Action.

165.    Plaintiffs, therefore, seek a declaratory judgment, on behalf of themselves and the

Class, regarding each of the contentions set forth in this Cause of Action.  A declaratory

judgment determining that Plaintiffs and the Class are due coverage under their insurance

policies, as set forth above, will help to ensure the survival of these businesses during this

prolonged closure made necessary by the Orders and by the presence of Coronavirus around the

businesses during this global pandemic.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and the New York and

Connecticut Subclasses, pray for judgment in their favor and against Defendant, as follows:

a.    For a declaration adopting each of Plaintiffs' contentions set forth in the above
Cause of Action for Declaratory Relief;

b.    For injunctive relief enjoining and restraining Defendant's unlawful, unfair,
and/or deceptive conduct as alleged herein, including but not limited to its
unlawful, unfair, and/or deceptive business practices and its wrongful denials of
coverage under Plaintiffs' and the Class' and the New York and Connecticut
Subclasses'  insurance policies;

c.    For specific performance of the insurance policies;

d.    For general and compensatory damages, restitution, and disgorgement, in an
amount to be determined at trial;

e.    For civil penalties under Conn. Gen. Stat.§ 42-110o(b), treble damages under
N.Y. Gen. Bus. Law § 349(h) (up to the statutory limit), and other such relief as
otherwise available;

f.    For exemplary or punitive damages as available under Conn. Gen. Stat.§ 42-
110g(a), N.Y. Gen. Bus. Law § 349(h), or as otherwise recoverable.

g.    For  costs of suit;

-37-

h.   For reasonable attorney's fees incurred in this action pursuant to Conn. Gen. Stat. § 110g(d), N.Y. Gen. Bus. Law §§ 349(h), or as otherwise recoverable;

i.   For pre judgment and post-judgment interest; and

j.   For such other relief as the Court may deem proper.

## VIII.   <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a trial by jury.

Dated:  September 1, 2020           */s/ David S. Stellings*

David S. Stellings
dstellings@lchb.com
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

Robert J. Nelson (to be admitted *pro hac vice*)
rnelson@lchb.com
Fabrice N. Vincent (to be admitted *pro hac vice*)
fvincent@lchb.com
Jacob H. Polin (to be admitted *pro hac vice*)
jpolin@lchb.com
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Alexandra L. Foote (to be admitted *pro hac vice*)
alexandra@afootelaw.com
LAW OFFICE OF ALEXANDRA L. FOOTE, P.C.
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  786.408.8083
Facsimile:  415.956.056

*Attorneys for Plaintiffs*
*Rye Ridge Corp. and Haromar Inc.*